UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF ALABAMA

In re:                                                                                          Case No. 03-32063-WRS

TERRY MANUFACTURING
COMPANY INC.,

    Debtor.


J. LESTER ALEXANDER III, TRUSTEE

    Plaintiff,                                                                      Adv. Pro. No. 05-3042-WRS

v.

N.D. HORTON, JR., AND
JAMES M. REYNOLDS, III

    Defendants.


## MEMORANDUM DECISION

    This Adversary Proceeding came before the court for trial on March 28 and 29, 2006. Plaintiff J. Lester Alexander, III (Trustee), present in person and by counsel Brent B. Barriere and Catherine E. Lasky. C. Ellis Brazeal, counsel for the Defendants N.D. Horton and James M. Reynolds, III, was present as was Defendant N.D. Horton, Jr. The Court heard evidence and took the Adversary Proceeding under advisement. The Parties have filed Proposed Findings of Fact and Conclusions of Law. (Docs. 86, 87). For the reasons set forth below, judgment is entered in favor of the Trustee and against Defendants Horton and Reynolds in the amount of $596,738.60.

# I. FACTS

This Adversary Proceeding is part of a large and unusually complex bankruptcy case. The discussion of the facts will be divided in three parts. In the first part, the Court will discuss the Terry Manufacturing bankruptcy case and the criminal proceedings against Roy and Rudolph Terry. The transactions which gave rise to this Adversary Proceeding did not take place in a vacuum but rather in the context of a larger universe of facts. It is necessary to provide some background to give context to the immediate facts of the transactions in question. In the second part, the Court will set out the facts of the transactions which are directly relevant to this Adversary Proceeding. These facts are not in dispute and are taken directly from a stipulation filed by the parties. In the third part the Court makes findings of fact on several matters which are in dispute, most notably the question of whether Terry Manufacturing received reasonably equivalent value in return for cash transfers totaling $596,738.60.

## A. Background

Terry Manufacturing, Inc., filed a voluntary petition in bankruptcy pursuant to Chapter 11 of the Bankruptcy Code in this Court on July 7, 2003. J. Lester Alexander was appointed as a Trustee in the Chapter 11 case on July 11, 2003.[1] This Chapter 11 case was converted to a case under Chapter 7 on May 13, 2004. This Court's Memorandum Decision of May 13, 2004, details some of the Court's concerns in this case. (Case No. 03-32063, Doc. 580). The record in

---

[1] Trustees are not usually appointed in cases under Chapter 11 in this Court. See, 11 U.S.C. § 1104. It is highly unusual for one to be appointed so soon after the filing of the petition.

this bankruptcy case is replete with evidence of missing records, check kiting, and large unexplained transfers of millions of dollars.

Terry Manufacturing was in the business of making uniforms and sportswear. It had contracts to supply uniforms to the McDonalds' hamburger restaurants and to the United States Department of Defense. Terry Manufacturing was a minority owned business which, from all outside appearances, was well positioned to compete for large contracts to supply uniforms to large institutional purchasers. Terry Manufacturing had its principal place of business in Roanoke, Alabama, and at one time employed a large number of people there.

The principals of Terry Manufacturing are two brothers, Roy and Rudolph Terry. Roy Terry was the Chief Executive Officer, first in command, and Rudolph Terry was the Chief Financial Officer, second in command and partner in crime. In June of 2005, Roy Terry entered into an agreement with the Government to plead guilty to 13 counts of mail fraud, wire fraud and a whole potpourri of wrongdoing and skullduggery, all relating to Roy Terry's leadership at Terry Manufacturing. The Government's criminal case against Roy Terry is set forth in considerable detail in a Plea Agreement which is on file with the District Court in Case No. 05-CR-141, in proceedings styled <u>United States v. Roy Terry</u>. The parties (Roy Terry and the Government) agree, on page 9 of the Plea Agreement, that "the actual loss in this case is more than $20 million but less than $50."[2]

Roy Terry pledged his cooperation to the Government in the Plea Agreement, which resulted in the indictment of Rudolph Terry on similar charges in proceedings styled <u>United</u>

---

[2] Roy Terry reserved his right to argue that the loss would have been less had he been permitted to "implement his business plan for Terry Manufacturing Company into and through the Company's bankruptcy proceedings." Such a claim is outrageous. Roy Terry's only plan was to loot the estate. Had he been permitted to fully implement his plan, the loss would have been more than $50 million.

-3-

States v. Rudolph Terry, Case No. 06-CR-52. The Government has concluded that Rudolph is less culpable than Roy in that his recommended sentence is only 48 months, while Roy's is 133 months. Neither Rudolph nor Roy has, as of yet, been sentenced. It is of more than passing interest here that the $5.5 million loan from American Real Estate to Roy Terry is discussed in both plea agreements. Both Roy and Rudolph Terry have pleaded guilty to, among other things, having made misrepresentations to Horton in connection with the loan.

### B. Stipulated Facts

The parties entered into a Stipulation of Facts. (Doc. 83). The stipulation provides as follows:

1. Messrs. Horton and Reynolds were owners of common stock of Perky Cap Company, Inc. ("Perky Cap"), a manufacturer headquartered in Eaton [sic], Georgia.

2. On November 10, 2000, Cotina Terry, daughter of Roy Terry, executed a Purchase Money Promissory Note (the "Cotina Terry Note") in the principal sum of TWO HUNDRED THOUSAND NO/100 ($200,000.00) DOLLARS, bearing interest at the rate of 9% per annum.

3. The Cotina Terry Note was made payable to Mr. Horton and Mr. Reynolds, and was purportedly given in consideration of 9,000 shares of Perky Cap common stock to

Cotina Terry by Messrs. Horton and Reynolds. These shares represented ten (10%) percent of the outstanding common stock of the Company.

4. Terry Manufacturing was not a signatory to the Cotina Terry Note.

5. All payments on the Cotina Terry Note were made by Terry Manufacturing to Messrs. Horton and Reynolds. The Note was paid in full with payments totaling TWO HUNDRED THIRTY-FOUR THOUSAND, THREE HUNDRED SEVENTY-FIVE DOLLARS AND 81/100 ($234,375.81).

6. On November 10, 2000, Allie Robinson, wife of Rudolph Terry, executed a promissory note in a form identical to that executed by Cotina Terry. The note was designated a Purchase Money Promissory Note (the "Allie Robinson Note"), and, like the note executed by Cotina Terry, was in the principal sum of TWO HUNDRED THOUSAND ($200,000.00) DOLLARS, and provided for 9.5% interest. Also, like the Cotina Terry Note, the promissory note executed by Allie Robinson was given for and in consideration of 9,000 shares of Perky Cap Stock sold to Ms. Robinson by Messrs. Horton and Reynolds. These shares represent (10%) percent of the outstanding common stock of Perky Cap.

7. Terry Manufacturing was not a signatory to the note executed by Ms. Robinson.

8. Terry Manufacturing executed written guarantees of the promissory notes executed by Ms. Terry and Ms. Robinson.

9. The Perky Cap common stock purchase by Cotina Terry and Allie Robinson was registered in their names, and they received all benefits flowing to holders of Perky

Cap Stock, which would have included recognizing for federal tax purposes their respective shares of losses recorded by Perky Cap, a sub-s corporation.

10. Terry Manufacturing was never a shareholder of Perky Cap. None of the stock purchased by Ms. Robinson or Ms. Terry was registered in its name.

11. On May 20, 2002, Roy and Rudolph Terry jointly executed a promissory note, in favor of Messrs. Horton and Reynolds, in the principal amount of SIX HUNDRED TWENTY-FOUR THOUSAND NO/100 ($624,000.00) DOLLARS, and bearing interest at the rate of 9.5% per annum. In consideration thereof, Messrs. Horton and Reynolds purportedly transferred to Roy and Rudolph Terry, jointly, 27,900 shares of Perky Cap common stock, representing thirty-one (31%) percent of the outstanding common stock of that company. The parties do not stipulate as to whether the shares were actually transferred. If, in fact, the shares were transferred, they were registered in the name of Roy and Rudolph Terry, individually, and Terry Manufacturing had no interest in the shares whatsoever.

12. Terry Manufacturing made all payments on the note executed by Roy and Rudolph Terry. Payments continued until May, 2003, and totaled ONE HUNDRED TWENTY-SEVEN THOUSAND, NINE HUNDRED EIGHTY-SIX DOLLARS AND 98/100 ($127,986.98). No payments were made after the Chapter 11 filing by Terry Manufacturing.

13. Terry Manufacturing made total payments of FIVE HUNDRED NINETY-SIX THOUSAND, SEVEN HUNDRED THIRTY-EIGHT DOLLARS AND 60/100

($596,738.60) to Messrs. Horton and Reynolds in connection with the promissory notes executed by Cotina Terry, Allie Robinson and Roy and Rudolph Terry.

14. A number of entities were unsecured creditors of Terry Manufacturing prior to November 10, 2000 (the date on which Cotina Terry and Allie Robinson delivered their respective promissory notes to Messrs. Horton and Reynolds), and remained unsecured creditors of Terry Manufacturing as of the date Terry Manufacturing filed for relief under Chapter 11 of the Bankruptcy Code. These unsecured creditors include American Express, Southern Mills, Arkansas State Highway Employees Retirement System, Arkansas Department of Economic Develop, CIT Financial Services, Miliken & Company, Darwood Manufacturing, HLC Industries, Inc., Atlantic Thread and Supply Company, Inc., and Bonifay Manufacturing Company.

### C. Additional Findings of Fact

#### 1. Reasonably equivalent value

Reduced to its most basic terms, this Adversary Proceeding involves the repayment of debts owed by Terry insiders, (Roy Terry, Rudolph Terry, Cotina Terry and Allie Robinson), by Terry Manufacturing. The debts were owed to Defendants Horton and Reynolds. As set forth in Part I(B) above, the parties do not dispute this much. The dispute here centers on whether Terry Manufacturing received reasonably equivalent value in exchange for the payments of the indebtedness owed by the Terry insiders.

The Defendants contend that Terry Manufacturing received value in that on the same date of the execution of the Promissory Notes by Cotina Terry and Allie R. Robinson, (November 10, 2000), in favor of Horton and Reynolds, American Real Estate Investment Company made a loan of $5,500,000, to Rudolph and Roy Terry. The loan was guaranteed by Terry Manufacturing. The logic of this claim is immediately suspect. Why such a byzantine structure? American Real Estate loans $5.5 million to Roy and Rudolph, so Terry Manufacturing should pay the promissory notes owed by Cotina and Allie to Horton and Reynolds? Arguments such as this leave one grasping madly for a bottle of aspirin.

Apparently recognizing the incongruity of their argument on its face, the Defendants layer an additional claim on what is already a convoluted argument. Roy and Rudolph, the Defendants claim, transferred some, or most, or all, of the $5.5 million to Terry Manufacturing. Why so much? Horton testified at trial that one would not send $5.5 million to safeguard $400,000. It is also true, that there is a daisy chain of millions of dollars of cash transferred between Terry Manufacturing and related entities. Even if one can identify $5.5 million transferred by Roy and Rudolph to Terry Manufacturing, tens of millions of dollars were transferred out, leaving one no closer to an explanation which rings true.

Horton testified at trial that he would not have made the loans to Cotina Terry and Allie Robinson for the purchase of the Perky Cap stock, but for the repayment of the loan by Terry Manufacturing. Horton's claim is wholly lacking in logic. The repayment of the Cotina and Allie loans by Terry Manufacturing was not done until a later point in time. The documentary evidence at trial shows a complex relationship between Terry Manufacturing on the one hand and Horton and Reynolds on the other. None of this documentary evidence suggests any

relationship to the Cotina and Allie loans. Having considered Horton's testimony, the Court finds that it is not credible and that his claims of a tie have been fabricated to provide a defense to the Trustee's avoidance action.

The Terry Manufacturing bankruptcy proceedings have been of unusual complexity. The Court has struggled with the bankruptcy case and dozens of adversary proceedings such as this spun off in all directions for more than three years. If one thing can be said with any certainty at all, it is that nothing in this case is as it first glance seems. Having considered the testimony of the witnesses, having considered the voluminous record in this Adversary Proceeding, having struggled to make some sense of this matter, the Court finds that the $5.5 million loan to Roy and Rudolph, while made on the same day as the promissory notes by Cotina and Allie, were not made in exchange for one another. None of the documents created on November 10, 2000, suggest such a connection and no credible evidence supports such a finding. Indeed, it appears that the $5.5 million loan was made as a result of the fraud perpetrated by Roy and Rudolph Terry and had nothing to do with the purchase of the Perky Cap stock by Cotina and Allie.

The Defendants argue that Terry Manufacturing further received a benefit in that when Cotina and Allie bought stock in Perky Cap they assured Terry Manufacturing a ready source of caps, which would enhance the sales of uniforms by Terry Manufacturing. The evidence did not bear out this contention. First, it appears that Perky Cap had been selling caps to Terry Manufacturing long before Cotina and Allie had purchased any stock. The evidence further showed that Perky Cap was anxious to sell its products to Terry Manufacturing and that it was not necessary to purchase Perky Cap stock as an inducement. Second, there are many suppliers of caps throughout the world who are capable of producing the caps needed by Terry

Manufacturing. There was no evidence that the purchase of caps had ever been a problem for Terry Manufacturing.

The Defendants contend that further value to Terry Manufacturing may be inferred from a $1.5 million loan from Peoples Bank, which Horton claims he was instrumental in obtaining for Terry Manufacturing. The Peoples Bank loan was the subject of another fraudulent conveyance proceeding which was pending in this Court for several years. See, Alexander v. The Peoples Bank, Adversary Proceeding No. 04-3061, in the United States Bankruptcy Court for the Middle District of Alabama. The Peoples Bank Adversary Proceeding was consolidated with Adversary Proceedings brought against First Tuskegee Bank and Bank of Wedowee in Adversary Proceedings 04-3062 and 04-3063. The three Adversary Proceedings were consolidated and referred to informally as the "Three Bank Case." The Three Bank Case was hotly litigated for more than two years and came before the Court a number of times on motions to dismiss, motions to compel, motions for summary judgment and the like. The Trustee reached separate settlements with each of the three banks and none went to trial. Nevertheless, the Court became familiar with the facts of those cases. Each of the Three Banks screamed long and loud about fraud perpetrated by Roy and Rudolph Terry, check kiting, destruction of records, and the rest of a now familiar litany of depredations.

The problem with all of the Defendants' arguments which contend that value for the payments in question was given in the form of one or more loans to Terry Manufacturing is that there is no credible evidence that this is so. The Terry Manufacturing bankruptcy has generated a mountain of paper, not one page of which suggests that there was a connection. Second, considering the way in which Terry Manufacturing did business, this claim does not make sense.

-10-

Third, the trial testimony offered in support of this defense suffers from the appearance that it is nothing more than a post hoc attempt to bolster a defense to the Trustee's fraudulent conveyance suit, which does not ring true. Having considered all of the evidence, the Court finds that none of the loans to Terry Manufacturing (the $5.5 million from American Real Estate, the $1.5 from Peoples Bank, and the advance from Wholesale Distributors) were given in exchange for the payments in question on the indebtedness owed by the Terry insiders.

### 2. Insolvency

The payments in question were made between December 10, 2000, and May of 2003. It is necessary for the Trustee to prove that Terry Manufacturing was insolvent at the time the payments were made. The Trustee is a Certified Public Accountant. Alexander, together with his firm AEA Group, LLC, examined the books and records of Terry Manufacturing. Alexander's report is offered as Plaintiff's Exhibit 44. Alexander concludes that Terry Manufacturing was insolvent at least as early as July 7, 1999. The Court, having heard Alexander's testimony and having reviewed his report, finds that he is forthright and credible. Based upon Alexander's testimony, the Court finds that Terry Manufacturing was insolvent on July 7, 1999, and at all times subsequent through the date of the petition in bankruptcy, which was July 7, 2003.

## II. CONCLUSIONS OF LAW

This Adversary Proceeding was brought by a Trustee in bankruptcy to recover certain payments made by the Debtor as fraudulent conveyances. This Court has jurisdiction to hear this Adversary Proceeding pursuant to 28 U.S.C. § 1334. This is a core proceeding. 28 U.S.C. § 157(b)(2)(F).

### A. Fraudulent Conveyance law

A trustee in bankruptcy may recover a fraudulent conveyance under several different theories. Applicable here is 11 U.S.C. § 544(b) and Alabama Code § 8-9A-5.[3] The stipulation provided by the parties identifies a number of actual creditors who were in existence as of November 10, 2000. See, Section I(B)(14) above.

The Trustee in bankruptcy succeeds to the interests of existing creditors. Section 544(b)(1), of Title 11, United States Code, provides as follows:

> The trustee may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim that is allowable under section 502 of this title or that is not allowable only under section 502(e) of this title.

---

[3] The Alabama Fraudulent Conveyance Act, 8-9A-1, et. seq., defines the cause of action differently depending upon whether the creditor who brings suit is in existence at the time of the transfer. Because the cause of action for creditors who are in existence at the time of the transfer action requires proof of fewer elements than does the cause of action for creditors whose claim arises after the transfer, a trustee in bankruptcy will usually try to identify creditors whose claims were in existence at the time of the transfer. Cf. 8-9A-5 (present creditors) and 8-9A-4 (future creditors). Because the Trustee in this case has elected to stand in the shoes of existing creditors, the Court will consider Ala. Code § 8-9A-5, rather than § 8-9A-4.

-12-

As we have identified creditors whose rights the Trustee has succeeded to, we must next look to "applicable law," which is the Alabama Uniform Fraudulent Transfer Act. Section 8-9A-5(a) of the Code of Alabama, provides as follows:

> A transfer made by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made if the debtor made the transfer without receiving a reasonably equivalent value in exchange for the transfer and the debtor was insolvent at the time.

There are four elements to the Trustee's case:

1. Is there a creditor who was in existence at the time the transfers in question were made?

2. Were transfers made?

3. Did the Debtor receive "reasonably equivalent value in exchange for the transfer?"

4. Was the Debtor insolvent at the time?

The first two elements are established pursuant to stipulations entered into by the parties. The fourth element, solvency, was established by Alexander's testimony and was not disputed in the Defendant's case. Therefore, this case turns on the question of whether the cash transfers in question, which total $596,738.60, were made in exchange for reasonably equivalent value.

### B.  Reasonably Equivalent Value

This Adversary Proceeding turns on the question of whether Terry Manufacturing was given reasonably equivalent value for the cash transfers in question. Value is further defined, at Ala. Code § 8-9A-3, as follows:

-13-

Case 05-03042    Doc 88    Filed 05/30/06    Entered 05/30/06 15:15:16    Desc Main
Document      Page 13 of 16

> (a) Value is given for a transfer if, in exchange for the transfer, property is transferred or an antecedent debt is secured or satisfied, but value does not include an unperformed promise to furnish support to the debtor or another person made otherwise than in the ordinary course of the promisor's business.
>
> * * *
>
> (c) A transfer is made for present value if the exchange between the debtor and the transferee is intended by them to be contemporaneous and is in fact substantially contemporaneous.

The facts of this Adversary Proceeding are analogous to the facts of a case handed down by the United State Court of Appeals for the Eleventh Circuit sixteen years ago. <u>General Electric Credit Corporation of Tennessee v. Murphy (In re: Rodriguez)</u>, 895 F.2d 725 (11th Cir. 1990). In <u>Rodriguez</u>, a corporate debtor, Domino Investments, Inc., made payments on a loan made to International Aviation Investment, Inc., by General Electric. International Aviation had purchased a jet airplane financing the purchase with a loan from General Electric. When International Aviation could no longer make the payments, Domino Investments made the payments for a period of time. International Aviation was a wholly owned subsidiary of Domino. The trial court found that General Electric had failed to show that Domino had received either a direct or indirect benefit as a result of the transfer.

The analysis provided by the Eleventh Circuit in <u>Rodriguez</u> is instructive here. "The purpose of voiding transfers unsupported by 'reasonably equivalent value' is to protect creditors against the depletion of a bankrupt's estate. (citations omitted). Therefore, this provision does not authorize voiding a transfer which 'confers an economic benefit upon the debtor.' either

-14-

directly or indirectly." Rodriguez, 895 F.2d 725, 727. Also instructive is this passage from Chase & Sanborn.

> It has long been established that "whether fair consideration has been given for a transfer is 'largely a question of fact, as to which considerable latitude must be allowed the trier of the facts.'" Mayo v. Pioneer Bank & Truste Co., 270 F.2d 823, 829-30 (5th Cir. 1959)(Wisdom, J.), cert. denied, 362 U.S. 962, 80 S.Ct. 878, 4 L.ed.2d 877 (1960). The burden of proving lack of "reasonably equivalent value" * * * rests on the trustee challenging the transfer. (citation to Rodriguez). Nordberg v. Arab Banking Corporation, (In re: Chase & Sanborn Corporation), 904 F.2d 588, 593-94 (11th Cir. 1990).

It should be noted that both Rodriguez and Chase & Sanborn are fraudulent conveyance cases decided under § 548 and not under State fraudulent conveyance statutes. However, operative language of § 548 and Alabama Code § 8-9A-5 is nearly identical. For this reason, the analysis provided in Rodriguez and Chase & Sanborn is exceedingly persuasive, if not strictly speaking, binding on this Court. The Defendants have cited the Court to the indirect benefit rule, citing a case from the Second Circuit. This Court agrees that the indirect benefit rule applies here and further finds, as a factual matter upon its independent review of the evidence, that no indirect benefit was provided to Terry Manufacturing.[4] Therefore, this Court has considered whether an indirect benefit was provided to Terry Manufacturing and finds that one has not.

Some of the promissory notes owed by Terry insiders, and paid by Terry Manufacturing, were guaranteed by Terry Manufacturing. Thus, it might be argued that Terry Manufacturing

---

[4] In a decision handed down in 1993, this Court applied the "indirect benefit rule" in a case decided under § 547 of the Bankruptcy Code. See, Memory v. Alfa Mutual Fire Insurance Company (In re: Martin), 205 B.R. 646, 650 (Bankr. M.D. Ala. 1993)(Steele, C.J.)(Applied indirect benefit rule without expressly determining that it applied in that case).

-15-

received value by discharging its liability on the guarantee. However, the execution of the guarantee agreements by Terry Manufacturing was, in itself, a fraudulent conveyance because it is part and parcel of a transfer for which it did not receive consideration.

The Defendants cite the Court to decision handed down by the Eleventh Circuit in <u>Grissom v. Johnson (In re: Grissom)</u>, 955 F.2d 1440 (11th Cir. 1992), as controlling precedent here. (Doc. 86, p. 10). As <u>Grissom</u> is no longer good law in light of the Supreme Court's decision in <u>BFP v. Resolution Trust Corporation</u>, 511 U.S. 531, 114 S.Ct. 1757, 128 L.Ed.2d 556 (1994); the Court declines to consider <u>Grissom</u> here.

### **III. CONCLUSION**

Terry Manufacturing made payments totaling $596,738.60 to Horton and Reynolds for debts owed by the Terry insiders. As the Court has found that no value was received by Terry Manufacturing in exchanges for the payments, the payments in question are constructively fraudulent and are to be set aside for the benefit of the creditors of Terry Manufacturing. Judgment will be entered by way of a separate document.

Done this 30th day of May, 2006.

/s/ William R. Sawyer
United States Bankruptcy Judge

c: Brent B. Barriere,
 Catherine E. Lasky, Attorneys for Trustee
 C. Ellis Brazeal, III, Attorney for Defendants